# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00064-CV

**Ashley Gail Matusek, Appellant**

**v.**

**James Charles Twine, Appellee**

### FROM THE 426TH DISTRICT COURT OF BELL COUNTY
### NO. 288,320-E, THE HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Ashley Gail Matusek appeals from the trial court's modification order giving appellee James Charles Twine the right to determine the primary residence of their daughter, Brandy,[1] who was about six years old at the time of trial. We will affirm the trial court's order.

### STANDARD OF REVIEW

In considering issues of conservatorship and possession, the child's best interest is our primary concern. Tex. Fam. Code § 153.002. As relevant here, a trial court may modify a conservatorship order only if the change is in the child's best interest and if the circumstances of the parents or the child have materially and substantially changed since the order was rendered. *Id*. § 156.101(a)(1). The party seeking modification has the burden of proof. *Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied).

---

[1] For purposes of privacy, we will refer to the child by a pseudonym.

Because conservatorship determinations are "intensely fact driven," *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002), the trial court is in the best position to observe the witnesses and "can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). We will not disturb a trial court's decision on a motion to modify unless the complaining party shows a clear abuse of discretion. *Zeifman*, 212 S.W.3d at 587. In an appeal from such a decision, challenges to the sufficiency of the evidence are not independent grounds of error, but instead are relevant when assessing whether the trial court abused its discretion. *Id.*; *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). We ask first whether the court had sufficient information on which to exercise its discretion and second whether it erred in applying its discretion. *Zeifman*, 212 S.W.3d at 588; *Panalez v. Telano*, No. 03-14-00675-CV, 2015 WL 7422972, at *2-3 (Tex. App.—Austin Nov. 19, 2015, no pet.) (mem. op.). We will not find an abuse of discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Zeifman*, 212 S.W.3d at 587. If the trial court's decision is supported by such evidence, we will not substitute our judgment for that of the trial court. *Fox v. Fox*, No. 03-04-00749-CV, 2006 WL 66473, at *4 (Tex. App.—Austin Jan. 13, 2006, no pet.) (mem. op.); *Echols*, 85 S.W.3d at 477.

In evaluating the evidentiary support for a trial court's findings of fact, we apply the same standards we apply in reviewing a jury's findings. *State v. Crawford*, 262 S.W.3d 532, 544 (Tex. App.—Austin 2008, no pet.). In reviewing legal sufficiency, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact-finder could have done so and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). When a party who did

2

not have the burden of proof challenges the legal sufficiency of the evidence, she must show that there is no evidence or no more than a scintilla of evidence to support the adverse finding. *City of Austin v. Chandler*, 428 S.W.3d 398, 407 (Tex. App.—Austin 2014, no pet.). When reviewing factual sufficiency, we consider all the evidence and will set aside a finding only if the supporting evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Id.* The fact-finder is the sole judge of witness credibility and the weight to be given to the testimony, and we may not substitute our judgment on such issues. *Id.*; *Florey v. Estate of McConnell*, 212 S.W.3d 439, 445 (Tex. App.—Austin 2006, pet. denied).

Whether circumstances have materially and substantially changed is a fact-specific determination not guided by rigid or definite rules. *Zeifman*, 212 S.W.3d at 593. Similarly, "[t]here is no bright-line rule to determine what is in the best interest of the child; each case must be determined on its unique set of facts." *Kogel v. Robertson*, No. 03-04-00246-CV, 2005 WL 3234627, at *6 (Tex. App.—Austin Dec. 2, 2005, no pet.) (mem. op.) (citing *Lenz*, 79 S.W.3d at 19).

## PROCEDURAL AND FACTUAL BACKGROUND

Brandy was born in March 2011. In addition to Brandy, Matusek has two older children from an earlier relationship, and Brandy has always primarily lived with Matusek and those half-siblings. In July or August 2011, when Brandy was three or four months old, Twine moved to Houston for law school. He and Matusek ended their relationship in the summer of 2012. At the time of trial, which began in February 2017, Twine was married to Deah Twine, whom he married in 2016 after dating for several years. Matusek was married to Jason Bauerkemper, whom she married in November 2016, about four months before trial.

In 2014, the original order in a suit affecting the parent-child relationship (SAPCR) was signed, appointing Matusek and Twine as the child's joint managing conservators, giving Matusek the right to determine Brandy's primary residence, ordering Twine to pay $1,000 a month in child support, and giving him the right to visitation under the standard possession order. *See* Tex. Fam. Code §§ 153.3101-.317 (provisions related to standard possession order). The order included a "morality clause" that stated that "no unrelated person of the opposite sex with whom the parent is involved in an intimate relationship shall spend the night when the [child is] in the parent's care," unless the parent is engaged to that person or the clause was waived in writing by the parties ahead of time.

In August 2016, Twine filed a petition to modify, seeking the right to determine Brandy's primary residence. A two-day hearing was held on February 9 and March 29, 2017, and the modification order was signed in November 2017, giving Twine the right to determine Brandy's primary residence within Williamson County and contiguous counties, ordering Matusek to pay $100 a month in child support, and setting out Matusek's visitation schedule.

Because Matusek challenges the evidentiary support for several of the trial court's findings, we will summarize the evidence presented at the hearing in some detail.

*Matusek's relationships*

- Matusek started dating Stefan Demos shortly after she ended her relationship with Twine and when Brandy was about eighteen months old. She and Demos married in 2015.

- In the spring of 2016, Matusek had an affair with Demos's best friend, Cliff Crose, who was married and had children. In June 2016, Crose and Matusek told their spouses about the relationship.

- Matusek filed for divorce from Demos in late July 2016 and began a relationship with Jason Bauerkemper shortly after. She and Bauerkemper got engaged the day after her divorce was finalized in September 2016. Matusek and her children moved in with

4

Bauerkemper soon after the engagement, and Matusek and Bauerkemper married in November 2016.

### *Matusek takes Brandy to Houston after the affair is disclosed*

- After the affair was disclosed, Crose, Matusek, and Matusek's children went to Houston for several days. During that time, Twine texted Matusek to ask if he could pick up Brandy "wherever she is. So you can handle what ever is going on." He said Brandy "doesn't need to be in the middle of all that. Please let me come get her." Matusek refused, responding, "[Brandy] is with me. She's fine. It's not going to be handled overnight and she will be protected. I'm a little insulted that you think I wouldn't make sure of that." Twine replied that he did not know what was going on "but there is obviously some stuff going down. I'd like to make sure [Brandy] is not seeing or hearing anything she doesn't need to be hearing." When Matusek and her children returned from Houston, Brandy went to Twine for his scheduled visitation.

- Matusek told Twine in texts that she "went to Houston because [Crose's wife] threatened to kill herself and then told me I better pray our paths never cross again. . . . I have new guns. One that stays on my hip. It's why no one knows where I'm at but you. . . . [Crose's wife] is psychotic." At trial, Matusek denied that Crose's wife had threatened her and said that she and Crose took their guns with them to Houston "because his wife was threatening to kill herself." Crose said they went to Houston "to get the kids out of—not out of danger, but maybe just away from any of the—I don't know, parents argue. They fight. So just to remove them out of that kind of environment . . . ."

- Demos testified that he did not believe that the circumstances immediately following the disclosure of the affair was a safe situation for Brandy and that he thought Matusek had put her interests ahead of her children's.

### *Effects of changes on Brandy*

- Matusek admitted that she and Crose conducted their affair in her house while Brandy was present in the home but testified that Brandy never saw anything: "I had an affair. Unfortunately, my child was in the house. But she was never exposed to it, ever." Crose testified that he never saw Brandy when he went to Matusek's house. Twine, however, was not sure whether Brandy was exposed to the affair, explaining that he had concerns because Brandy is "inquisitive" and "doesn't necessarily like to be in a room by herself."

- Until Demos learned of Matusek's affair, Brandy was "very close" with Demos and called him "dad." Since the split, Demos has had no contact with her. Twine testified that Brandy was confused and that he did not know if she "was able to identify what was going on. And I think at some points it was upsetting to her. I mean, she went from having a stable father figure . . . to nothing. And now there was another man in her life."

5

- Matusek believed Brandy was "perfectly fine having lost" Demos as a father figure and had not had difficulty adjusting to that change. Nor did Matusek have concerns related to Brandy meeting Bauerkemper immediately after Demos ceased contact: "I believe that because I know my daughter, that she would love to know Jason because Stefan was not a good father and Stefan was not a good person. And that's why I needed to divorce him. And so the way or the timing-wise, I believe that [Brandy] benefitted from having a positive male influence in her life more than just what was ordered from the SAPCR."

- Asked whether he thought Matusek had considered Brandy's well-being in making her recent decisions about her relationships, Twine said, "Absolutely not." Twine believed Matusek had gone back to her "old ways": "she has a pattern and history of dating or being engaged to men and then having—having inappropriate relationships with other men and continues with those relationships, and then goes to the next relationship."

- Brandy changed schools in November 2016, during her first-grade year. Although Twine testified, "I think it was disruptive to her whole life," Matusek denied that it had been a difficult adjustment for Brandy.

### *Evidence related to Brandy's medical care*

- Twine testified that he had brought Brandy to most of her eye and dental appointments, which she had started having fairly recently. Matusek testified that she allowed Twine to bring Brandy to such appointments when he asked to and said that Brandy had been healthy and had not needed much in the way of medical care. She said she had been the parent to take Brandy to the doctor when she broke her leg shortly before trial.

- Twine and Deah testified that Brandy had had recurring issues with lice over a nearly two-year period. Twine believed the ongoing lice problem was related to Matusek's "inattentiveness," acknowledging that lice can be an issue with small children in general but saying, "the ongoing nature of it over and over again . . . requires you to constantly be on top of it and check for it." He and Deah testified that whenever Brandy came to their house, they would have her change clothes and comb her hair "just to make sure that she's not bringing any into our home." He said that he had tried several over-the-counter treatments and then finally took Brandy "several times" to an Austin clinic that specializes in treating for lice and offered to pay to treat Matusek's other children. Matusek acknowledged that Twine was "involved" in treating the lice problem and denied that she had failed to take any steps that could have helped with the outbreaks.

Twine argued that he had a more stable life and that Matusek had not put Brandy's interests before her own. Matusek asserted that it would harm Brandy to be sent to live primarily with Twine "[b]ecause you're taking my child away from the mother that she lived

6

with for six years and her—her siblings that she's lived with for six years in a very stable and loving environment." The trial court adjourned the evidentiary hearing without making a ruling, but the next day, on March 30, 2017, it made the following entry on its docket sheet:[2]

> Court's ruling on mtn/modify heard on Feb 9 & March 29, 2017—mtn/modify is granted—Parties are continued as JMC w/Pet having exclus right to design child's primary residence w/in Williamson & contig counties—Rep awarded SPO except that holiday rotations will continue with alternating periods per existing court order—mom to pay child support of $100/month begin April 1, 2017. dad's obligation to pay child support terminates effective this date—dad to maintain health ins & each to pay 1/2 uninsured med under usual terms and conditions . . . Pet's atty to prepare[] proposed order—attys permitted to appear telephonically in event mtn/enter order becomes necessary.

After multiple motions to enter order and responses and hearings on such motions, the trial court signed its modification order on November 1, 2017. The order gave Twine the right to determine Brandy's primary residence within Williamson County and contiguous counties, ordered Matusek to pay Twine $100 a month in child support starting April 1, 2017, set out her visitation schedule, and ordered that Twine's child support obligation terminated effective March 29, 2017.

## DISCUSSION

Matusek asserts that (1) several of the trial court's findings of fact are not supported by sufficient evidence and should be vacated; (2) the court abused its discretion in modifying the original order because the modification was not in Brandy's best interest; and (3) the judgment should be reformed to show a rendition date of November 1, 2017, rather than March 30, 2017. She does not contest that her divorce and remarriage amounted to material and substantial changes to the parties' circumstances.

---

[2] The record does not reflect how the parties were informed of the trial court's ruling.

### *Challenges to findings of fact*

In her first issue, Matusek challenges the legal and factual sufficiency of the evidence supporting the following findings of fact:

- Twine "had primarily been responsible for tending to the child's medical and dental needs";

- Matusek conducted an extramarital affair with Crose, and their relationship "took place in [Matusek's] home when the child was present";

- as a result of her affair, "[v]iolent threats were made against" Matusek;

- Twine tried to remove Brandy from the situation, but Matusek "refused to surrender the child to him and kept the child in Houston with she and Mr. Crose. [Matusek] returned from Houston and [Twine] had possession of the child for approximately 10 days"; and

- Matusek "has engaged in an unstable and chaotic lifestyle" that is not in Brandy's best interest.

Matusek first asserts that although the evidence shows that Twine took Brandy to some medical appointments, it also shows that Matusek "identified the child's health issues and led the decision-making about them." Matusek testified that she disagreed that Twine had taken care of Brandy's medical needs, saying that she initially raised concerns about Brandy's vision and that Twine volunteered to take her. She further stated that although Twine had driven Brandy to vision and dental appointments, that "does not mean that I have not been involved in her medical needs. . . . I've taken her to the doctor just the same as he has." She noted that she took Brandy to the doctor when she broke her leg shortly before trial and testified that she had been unable to testify about taking Brandy to any specific appointments because she "didn't calendar those things" and "could not remember a specific date." Twine testified that he was primarily responsible for Brandy's vision and dental needs and that he had managed to control Brandy's ongoing lice problem, which he attributed in part to Matusek's inattentiveness.

8

Matusek testified that she had not been inattentive and that she had been at least as involved in Brandy's medical needs as Twine. We cannot reevaluate the trial court's determinations related to witness credibility or its resolution of evidentiary conflicts. *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018). On this record, we cannot hold that a reasonable fact finder could not have found that Twine was primarily responsible for Brandy's dental and medical needs.

Matusek next complains about the finding that Brandy was present during Matusek's trysts with Crose, arguing that the evidence does not show that Brandy "witnessed or heard Matusek's amorous contact with Crose." However, Matusek herself testified that Brandy was present in the home during her assignations with Crose, and the trial court did not find that Brandy actually saw or heard anything of a sexual nature. The court found only that Brandy was "present" in the home, and the evidence supports that finding.

Matusek next attacks the trial court's finding that "[v]iolent threats" were made against her, stressing the fact that "[t]he word violent appears nowhere" in the reporter's record and asserting that "there's simply nothing about violence." However, Matusek admitted at trial that Crose's wife had made "threatening statements" to Matusek, Demos testified that he did not believe the immediate aftermath of the affair's disclosure was a safe situation for Brandy, Matusek texted Twine to say that Crose's wife had told Matusek that "I better pray our paths never cross again," Matusek and Crose took their weapons out of their homes and fled to Houston for several days, and Matusek told Twine that she had "new guns, one that stays on my hip," and that very few people knew where she was. As trier of fact, the trial court was entitled to draw reasonable and logical inferences from the evidence, *see In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (evidence relied upon to form inferences must be more than meager circumstantial evidence that "could

9

give rise to any number of inferences, none more probable than another"), and could have inferred that Crose's wife threatened Matusek's safety and did not simply threaten to harm herself. We cannot say that the finding related to violent threats is unsupported by the evidence.

Matusek argues that the evidence does not support the finding that she refused to allow Twine to remove Brandy from the aftermath of the affair's disclosure and instead kept her in Houston with her and Crose. She asserts that she and Brandy "weren't hiding out in a motel" and that they simply went to Brandy's grandmother's house, "every five year old child's dream: an extended sleepover at grandma's." However, the trial court did not find that Matusek and Brandy were "hiding out" or make findings related to the niceties of their time in Houston—it found that Matusek kept Brandy with her, refusing to allow Twine to remove the child from a seemingly volatile situation. And, although Matusek did not specifically state that she refused to "surrender" Brandy, after Twine texted several times to ask to keep Brandy while Matusek sorted out her situation, Matusek responded that Brandy was "fine" and "will be protected" and that Matusek was "insulted" that Twine might think otherwise. Twine responded, explaining that he did not intend to be insulting and that he simply did not want Brandy to hear or see "anything she doesn't need to be hearing" and asking again, "Please just let me come get her"; Matusek did not reply. The trial court's finding has sufficient evidentiary support in this record.

Finally, Matusek complains of the finding that she had "engaged in an unstable and chaotic lifestyle" that was not in Brandy's best interest. To support her argument, she cites to cases involving much more severe examples of chaotic and unstable situations, such as eviction, using drugs in a child's presence, or exposing a child to drugs or alcohol. *See In re E.A.D.P.*, No. 05-15-01210-CV, 2016 WL 7449369 (Tex. App.—Dallas, Dec. 28, 2016, no pet.) (mem. op.); *In re A.L.E.*, 279 S.W.3d 424 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

10

However, the fact that the situation could have been substantially worse does not mean that the trial court's finding was unsupported by the evidence. Matusek had an affair with her husband's close friend, who was also married and had children. When the affair was disclosed, Crose's wife made statements that moved Crose and Matusek to remove firearms from their homes and drive with her children to Houston for several days. When Matusek's marriage to Demos ended, Brandy abruptly lost one of her primary father figures, a man she had considered a "dad" since she was about eighteen months old. Matusek began a new relationship almost immediately after filing for divorce, announced her engagement the day or two after her divorce was final, moved herself and Brandy into a new home soon thereafter, and remarried a month or two later.[3] Although Matusek insisted that Brandy was adjusting well to the changes, Twine did not agree. He testified that he thought Brandy had been confused and upset and that he thought she would benefit from therapy. We cannot hold on this record that the trial court's finding of fact lacks evidentiary support.

We overrule Matusek's first issue on appeal.


### Challenges to best-interest determination

In her second issue, Matusek argues that the modification was not in Brandy's best interest and, therefore, that the trial court abused its discretion in making the change.[4]

---

[3] Matusek testified that she and her children had moved five times since the original order was signed, most recently moving in with Bauerkemper. Twine had moved three or four times.

[4] Matusek argues that a determination that the current situation was "unworkable or untenable does not justify a modification" because Twine was also required to show that the modification was in Brandy's best interest. She asserts that the trial court "relied on an incorrect legal standard by basing its decision, at least in part, on the child's current situation rather than whether the requested modification was in the child's best interest." However, in addition to concluding that the circumstances had changed, the court also concluded both that maintaining

11

In considering whether the evidence supports a conclusion that a modification is in a child's best interest, we consider the non-exhaustive list of factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). *See Zeifman*, 212 S.W.3d at 595. Those nine factors are: the child's desires, if the child is old enough for that to be appropriate; her emotional and physical needs now and in the future; emotional and physical danger to the child now and in the future; the parental abilities of those seeking custody; programs available to assist the parents to promote the best interest of the child; the parents' plans for the child; the stability of the home situations; a parent's acts or omissions that may indicate that the existing parent-child relationship is not proper; and any excuse for those acts or omissions. *Holley*, 544 S.W.2d at 371-72; *Zeifman*, 212 S.W.3d at 595. "In the context of custody modification, other factors to be considered include the child's need for stability and the need to prevent constant litigation in child-custody cases." *Zeifman*, 212 S.W.3d at 595.

The evidence shows that Matusek conducted an extramarital affair that resulted in her decision to remove herself and Brandy from the area for some number of days. Matusek then ended her marriage, which resulted in the abrupt removal of a long-time father figure from Brandy's life, and almost immediately started a new relationship, which quickly led to a new stepfamily, a new home, and a new school. Although Matusek insisted that Brandy was not having any trouble adjusting to those changes, Twine testified that she was confused and said he thought it "was upsetting to her." He also testified that although she had always done "fairly well" in school, she recently had "little reduced marks. But you know, I don't know what—this change, who knows what the basis of that is."

---

the status quo was not in Brandy's best interest and that allowing Twine to determine Brandy's primary residence was in her best interest. By those two conclusions, the court explained its decision that the requested modification was in Brandy's best interest. *See Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.)

Although Matusek insisted that she had always put her children's interest ahead of her own, Twine testified to the contrary, saying he believed her actions "were selfishly motivated" and taken without thought to Brandy's needs. Twine and his wife testified about their efforts to get Brandy's recurring lice problem under control, while Matusek characterized the lice issue as considerably less severe.

Twine and Brandy have a close relationship, and Matusek agreed that Twine was a good father. Brandy is also close to Deah and Deah's daughter from an earlier relationship, Brandy's stepsister. Twine and Deah married in February 2016 after dating for several years. The evidence about Bauerkemper's relationship with Brandy was Matusek's statement that he is "a wonderful stepfather." Matusek testified that Brandy was currently attending a good school, while Twine said the school in his neighborhood is "highly rated." Twine and Matusek both have comfortable homes with plenty of room.

Given the evidence in this record, we cannot conclude that the trial court abused its discretion in considering the evidence in light of the *Holley* factors and Brandy's overarching need for stability and concluding that allowing Twine to determine Brandy's primary residence was in Brandy's best interest. *See id.* We overrule Matusek's second issue on appeal.

### *Effective dates of modifications to child-support provisions*

Finally, Matusek argues that the trial court erred in making portions of its modification order, which was signed November 1, 2017, effective March 29 (the termination of Twine's child-support obligation) and April 1, 2017 (the beginning of Matusek's obligation to pay Twine $100 a month in child support). She does not challenge the court's authority to terminate Twine's child-support obligation or to order her to pay child support. She argues only

13

that the trial court's docket sheet, in which it indicated how it intended to rule, cannot be considered a "rendition of judgment," and that we should thus reform the judgment to reflect that the provisions related to child support became effective November 1.

Section 156.401 of the family code, which governs the modification of a child-support order, provides that an order may be modified retroactively to the earlier of the date of service of citation or an appearance in the suit to modify.[5]  Tex. Fam. Code § 156.401(b). Therefore, the trial court had the statutory authority to modify the child-support order to impose a child-support obligation on Matusek retroactive to April 1, 2017, and to terminate Twine's obligation effective March 29, 2017.  *See id.*; *see, e.g.*, *In re B.R.F.*, 457 S.W.3d 509, 510 (Tex. App.—El Paso 2014, no pet.) ("Retroactive support is authorized by statute but it is limited to the date citation was served upon the obligor or the date of obligor's appearance, whichever occurs earlier. Within these confines, the trial court has broad discretion." (citation omitted)); *Lee v. Lee*, No. 05-02-01742-CV, 2003 WL 21544510, at *2 (Tex. App.—Dallas July 10, 2003, no pet.) (mem. op.) ("child support may be properly modified retroactive to the date on which the motion to modify is filed"); *In re J.G.Z.*, 963 S.W.2d 144, 149 (Tex. App.—Texarkana 1998, no pet.) (effective date of modified child-support order "is within the broad discretion of the trial court").  Matusek has not shown an abuse of discretion in the court's determinations related to child support.  We overrule Matusek's third issue on appeal.

**CONCLUSION**

We have held that the trial court's findings of fact are supported by legally and factually sufficient evidence and that Matusek has not shown an abuse of discretion in its

---

[5] There is no dispute that Matusek had been served and had appeared in the suit to modify well before March 29, 2017.

determinations related to child support and to which parent should determine Brandy's primary residence.  We therefore affirm the trial court's modification order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed:   July 16, 2019